## THE UNITED STATES v. JUAN SANTISTEVAN.

PENAL STATUTES STRICTLY CONSTRUED.—The penal provisions of a statute must be interpreted strictly according to the context, to the exclusion of every inference suggested by extraneous circumstances.

QUALIFICATION OF DISJUNCTIVE CONDITIONS IN A STATUTE.—Where several conditions are set out disjunctively in a statute, a qualifying phrase attached to the last applies equally to each of the others which has not a qualifying phrase annexed to itself, and where the qualification will not render the condition inoperative.

ACTION FOR PENALTY UNDER INTERCOURSE ACT OF 1834.—An action to recover the penalty prescribed by the intercourse act of 1834, for unlawfully settling upon Indian lands, can be maintained only with respect to land belonging, secured, or granted to an Indian tribe "by treaty with the United States," and the petition must show that fact, or it will be bad on demurrer.

PUEBLO INDIANS NOT WITHIN INTERCOURSE ACT. — The pueblo Indians of New Mexico were, prior to the treaty of Guadalupe Hidalgo, citizens of Mexico, and their rights as such were guaranteed by that treaty, so that they now hold the same relation to the United States that they formerly held to the republic of Mexico.   They are, therefore, not Indian tribes within the meaning of the intercourse act of 1834, and no action lies under that act for a penalty for settling on the lands secured to them by patent from the United States, their rights and remedies as to such lands being the same as those of other citizens owning lands.

ERROR to the district court for the first judicial district. The plaintiffs brought their suit in the court below, to recover of the defendant the penalty in the sum of one thousand dollars, prescribed in section 11 of the act of congress, approved June 30, 1834, entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers," alleging in their petition that defendant theretofore "did make a settlement on and now occupies and is settled on lands of the pueblo tribe of Indians of the pueblo of Taos, situated in the county of Taos, in said district and territory," etc. (setting out the boundaries of said pueblo lands); "on ten acres of said lands, by then and there building houses and making fields thereon, contrary to the form of the statute in such case made and provided, said lands then and there, and at the time of bringing this suit, belonging to the said pueblo tribe of

Indians of the pueblo of Taos, aforesaid, and secured to the said pueblo tribe of Indians, of the pueblo of Taos, aforesaid, by patent from the United States."

To the plaintiff's petition the defendant demurred, specially and generally assigning for cause of special demurrer: 1. The said declaration shows that in case said lands belong to an Indian tribe, they belong to pueblo Indians, who are citizens of the United States, and not such Indian tribes as are contemplated by the statute of the United States. 2. That said declaration shows that said lands were secured to the said Pueblo Indians by patent from the United States, containing the same conditions, powers and authorities to the said patentees to transmit and convey their said lands as is given to any other citizens of the United States, and does not show that said lands have never been sold, transferred or conveyed by said pueblo Indians. The court below sustained this demurrer, and the plaintiffs in error seek in this court reversal of that judgment.

*T. B. Catron,* for the plaintiffs in error. 1. The petition is in accordance with the statute of the United States, and is sustained by it: 4 U. S. Stats., sec. 11, p. 728. 2. Said pueblo Indians have been recognized and treated by the federal departments as Indians in the ordinary acceptation of the term, and as such come under the law: 3 Wall. 407, two cases. 3. Whether any particular class of Indians are still to be regarded as a tribe, or have ceased to hold tribal relations, is primarily a question for the political departments of the government, and if they have decided it the courts will follow their lead: Id., and following. 4. The government of Spain, which originally granted the pueblo lands, held the fee in trust for the said Indians, which relation was never altered by any treaty with Mexico or the United States, or any change of the different governments: *Chouteau* v. *Molony,* 16 How. 237. 5. The pueblo Indians are a community or tribe of Indians, and hold no land in severalty within each pueblo.

*Wm. Breeden,* for the defendant in error. The law relied upon to support the action is found in 4 United

States Statutes at Large, sec. 11, p. 730.   The statute in question clearly intends what may be denominated "Indian lands," or lands to which the right of occupancy is secured or granted to an Indian tribe by treaty with the United States, and to which the ultimate absolute title is in the United States, and not lands held in fee by Indians who are citizens of the United States, and who are not Indians within the meaning of the statute, or in the usual acceptation. of the term.   The word tribe, as used with reference to Indians in the United States, is applied to nations of savages or uncivilized people, and that is the sense in which it is used in this statute, which applies only to lands, the right to the occupancy of which is held by uncivilized Indians having tribal organizations, and treated with by the government as independent political communities.   The wild tribes of Indians are distinct, independent political communities, retaining the right of self-government, under the protection of the United States: *Worcester* v. *Georgia*, 6 Pet. 515.   They are not regarded as the owners of the lands occupied by them.   Such lands are held to belong to the United States.   The Indians have only a right of occupancy: *United States* v. *Rogers*, 4 How. 567; *United States* v. *Rillieux's Heirs*, 14 Id. 189; *United States* v. *Fernandez*, 10 Pet. 303.   Over such lands the United States exercises authority for the benefit of the occupants, and to such lands the statute applies.   The pueblo Indians hold their lands in fee under patents from the United States, issued by authority of an act of congress confirming grants of lands made by the governments to which New Mexico formerly pertained.   The act of congress under which their patents were issued and the patents themselves are in no respect different from similar acts and patents for the benefit of individual citizens: See 11 U. S. Stats. at Large, 374.   The right of pueblo Indians to their lands was not derived from the United States, but by grant from the governments formerly exercising authority over New Mexico.   They did not look to the United States for title to their lands, or protection in their occupancy, except to carry out the obligations of the treaty of Guadalupe Hidalgo.   They were first

known to the United States as citizens holding title to their lands, and came under the government entitled to all the rights of citizens. No treaty was ever made between these people and the United States. They have no tribal organization, and are not a tribe of Indians. No department of the government has attempted, or had the right to attempt, to fix their status as or decide them to be Indians. They are civilized people, living in communities which are numerous and similar to those of the Shakers and other people living in communities in other parts of the United States, and are not Indians in contemplation of the statute under which suit is brought. As they came into the government so they must remain. These people hold their lands by patent from the United States. A patent carries the fee and divests all right of the United States; and after granting a patent the United States had no more authority over their lands than over those of any other citizen: *Hooper* v. *Scheimer*, 23 How. 235; 3 Wall. 492. The pueblos were citizens of the Mexican republic by virtue of the plan of Iguala, the treaty of Cordova, and decrees of the Mexican congress, found in a collection of decrees published by Mariano Galvani, vol. 1, secs. 12, 13, p. 4, and sec. 1, p. 32; also vol. 2, pp. 1, 80, 92, and sec. 16, p. 127. They were known as *naturales*, in contradistinction to *salvajes*, and were entitled to be recognized as Mexicans: Escriche, pp. 1272, 1273. They are citizens of the United States by virtue of the treaty of Guadalupe Hidalgo, and entitled to all the rights of citizenship: See Treaty, 9 U. S. Stats. at Large, pp. 929, 930, arts. 8, 9. Under the Mexican government, lands were granted to all Mexican citizens without distinction as to the rights conferred: See decree of Mexican congress, August 18, 1824, appendix to Escriche, called *Ordenanzas de tierras y aguas*, p. 194, art. 9, of said decree. Indians were competent to take, hold, and convey real estate under the Mexican government: *United States* v. *Ritchie*, 17 How. 539, 540. The second and third points made in the brief of the United States attorney, and the authorities cited, can not apply to this case, but only to the case of Indians whose tribal organization is recognized, and whose status as

Indians is fixed in the first instance by the political branch of the government, and as to the power of a state to withdraw such Indians from the operation of acts of congress concerning Indian tribes. The pueblo Indians are citizens, and their status can not be changed by action of a ministerial officer of the government, or of any department of the government. They are citizens of the United States. While the departments are competent to decide as to the continuance of the tribal organization of an Indian tribe, they can have no power to decide who are Indians, and certainly not to take away the rights of citizens. The pueblo Indians are subject to the jurisdiction of the United States; consequently they have the same rights to hold and convey property, and to make and enforce contracts, as other citizens: Const. U. S., art. XIV., and act of May 31, 1870; 16 U. S. Stats. at Large, sec. 16, p. 144. The district and supreme courts of New Mexico have decided adversely to the right of the United States to recover a penalty for settling on lands belonging to the pueblo Indians: See decisions supreme court New Mexico. If the defendant in error is an intruder upon the lands described in the petition of plaintiff, and a right of action exists against him, such right of action is in the pueblo, and he is not subject to a penalty to the United States, nor liable in any way under the statute upon which suit is brought.

By Court, JOHNSON, J.:

The question here raised is as to the "ability" (as it is termed by the statutes of this territory in relation to practice in our district courts), *i. e.*, the right of the plaintiffs to bring and maintain this action. In order to determine this question, it is necessary to consider not only whether the plaintiffs have properly set up their claim to the penalty prescribed in the eleventh section of the act of June 30, 1834, 4 U. S. Stats. at Large, 730, against the defendant for settling on any of the lands contemplated by the statute at the time of its enactment, but also whether the provisions of this section have been extended by congress to lands owned by inhabitants of the territory known as pueblo

Indians. The eleventh section above cited says: "If any person shall make a settlement on any lands belonging, secured, or granted by treaty with the United States to any Indian tribe, or shall survey, or shall attempt to survey, such lands, or designate any of the boundaries by marking trees or otherwise, such offender shall forfeit and pay the sum of one thousand dollars," etc. On the one hand, it is contended that the claim to. the penalty is sufficiently set up by the allegations that the lands belong to Indians and are secured to them by patent from the United States; while on the other hand it is contended that such claim is not sufficiently set up within the terms of the statute, unless it be alleged that such lands "belong to an Indian tribe by treaty with the United States," or "are secured to such tribe by treaty with the United States." The rules of interpretation require that the penal provisions of a statute be interpreted strictly according to its context, from which we are to infer immediately the intention of the legislature, and to the exclusion of any inference whatever suggested by extraneous circumstances. This section inflicts the penalty of forfeiture of the sum of one thousand dollars, for the offense of making a settlement "on lands belonging to any Indian tribe," "secured to any Indian tribe," "or granted" "to any Indian tribe;" and here it is necessary to ascertain if the qualifying phrase "by treaty with the United States," should be limited to lands "granted," or should be used likewise as a qualification of "belonging" and "secured." It should be considered a settled rule that where several conditions are set out disjunctively, the qualifying phrase annexed to the last-mentioned condition belongs equally to, or is descriptive of, each one of the antecedent conditions that has not annexed to itself a qualifying phrase, and when the application of such qualifying phrase would not render the condition legally inoperative.

Under this rule of construction, it is obvious that, according to the terms of this section, no forfeiture accrues unless it is made apparent that the defendant has violated one or more of its conditions qualified by the phrase "by treaty with the United States." The plaintiffs were cer-

tainly aware of the necessity of using some qualifying term
in connection with the word or condition "secured," as they
in their petition say "and secured to the said pueblo tribe
of Indians, of the pueblo of Taos, aforesaid, by patent from
the United States," because, if their argumentative hypothesis as to the construction of disjunctive conditions with
a qualifying phrase annexed to the one last mentioned had
governed them in drafting their petition, they would not
have used it in connection with the word or condition
"secured," which, in the text of the section under consideration, is practically as far from the qualifying phrase, and
also from the words "to any Indian tribe," as the word
"belonging."

The plaintiffs allege in their petition, that the lands
claimed to have been settled upon by defendant, in violation
of this section, were "secured to the said pueblo tribe of
Indians, of the pueblo of Taos aforesaid, by patent from
the United States." The text of the section under which
this suit is claimed to have been brought uses the phrase
"by treaty with the United States," and not "by patent
from the United States;" and therefore, as there is such a
wide difference between the meaning of the words "treaty"
and "patent," that the one can not be used in the same
sense as the other, none of the offenses or acts set out in
this section can be said to be charged in the petition, even
if the section were construed and interpreted as liberally as
the rules of interpretation allow.

Congress, in legislating, at that time, on the subject of
trade and intercourse with the Indian tribes, did so in pursuance of the clause of section 8, of article I of the constitution, which gives congress power "to regulate commerce
with foreign nations, and among the several states, and
with the Indian tribes." It is to be inferred that the
framers of the constitution, when they granted this power,
contemplated only the wild tribes which subsisted at that
time within the territorial jurisdiction of the United States,
and immediately adjacent to their borders. It can not be
said that the framers of that instrument contemplated any
other than the tribes of wild Indians, because there were

none of any other kind known to them, and statesmen of that day had enough to occupy their minds in taking care of the territory which had separated from the mother country, to entirely preclude any idea of the expansiveness inaugurated with the annexation of Texas. The forfeiture or penalty prescribed in the eleventh section of the act of June 30, 1834, is not for the benefit of the Indian tribe whose rights may be violated as therein specified, but its provisions are solely for the preservation of the government's paramount ownership of the soil, and to prevent any person whomsoever from interfering between itself and the Indian tribes in acquiring from them the possessory right which the Indians had hitherto. The Indian policy of the government is extensively discussed in *The Cherokee Nation* v. *Georgia*, 5 Pet. 1; in *Worcester* v. *Georgia*, 6 Id. 515; in *Mitchel* v. *United States*, 9 Id. 711; in *Clark* v. *Smith*, 13 Id. 195, and in other cases.

By section 7 of the act of congress approved February 27, 1851, entitled "An act making appropriations for the current and contingent expenses of the Indian department," etc., the laws regulating trade and intercourse with the Indian tribes are extended in these words: "All the laws now in force regulating trade and intercourse with the Indian tribes or such provisions of the same as may be applicable shall be, and the same are hereby extended over the Indian tribes in the territories of New Mexico and Utah." No other significance can be given to this section than that which it expresses in such very unambiguous language. Thus congress extended not over the territories of New Mexico and Utah, but over the Indian tribes in these territories, the laws in force on the twenty-seventh of February, 1851, regulating trade and intercourse with the Indian tribes; and as congress has made no change or modification of the eleventh section of the act of June 30, 1834, we certainly have no right to construe it as applicable to any other cases or circumstances than such as it was applicable to on the thirtieth of June, 1834.

Those inhabitants of this territory, commonly known as the pueblo Indians, were transferred with this territory by

Mexico to the United States by the treaty of Guadalupe Hidalgo, February 2, 1848, and, according to the terms of that treaty, have the same relations to the United States which they had to the republic of Mexico, both as regards their persons and property, at the time of the treaty.   These relations can only be modified, regulated, or changed by congress in accordance with the terms of this treaty.   Articles 8 and 9 of this treaty contain the guaranties entered into by the United States as to persons and property transferred by Mexico to the jurisdiction of the former, and by them are secured to all such persons the same rights of property as are enjoyed by all citizens of the United States, and to such persons as should not elect within the time specified in the treaty to retain the character of Mexican citizens admission '' to the enjoyment of all the rights of citizens of the United States according to the principles of the constitution.''   According to the decree dated at Iguala, February 24, 1821, section 12, these pueblo Indians were made citizens of New Spain, which afterwards became the republic of Mexico.   This section reads thus: ''Todos los habitantes de la Nueva España, sin distincion alguna de Europeos, Africanos ni Indios, son ciudadanos de esta monarquia, con opcion á todo empleo segun su merito y virtudes;'' which is translated: '' All the inhabitants of New Spain, without any distinction of Europeans, Africans or Indians, are citizens of this monarchy, with eligibility to every office, according to their merits and virtues.''   It might cursorily seem that the wild Indians are included in the term ''Indians,'' in this section; but such is not the fact, as by the usage of Mexicans the term *habitantes* is limited to persons having a place of abode, and does not embrace vagrants or nomads.   The pueblo Indians, however, had places of abode, and, consequently, came within this section, and were made citizens by it.   The thirteenth section of the same decree says: '' Las personas de todo ciudadanos y sus propiedades seran respetadas y protegidas por el gobierno,'' which is in English: '' The persons and property of every citizen shall be respected and protected by the government.''   These quotations are from Galvani's

collection of decrees, etc., of the Mexican nation, and others of like effect may be made from the same work. The term *propiedades* in Mexican law means property of all kinds, real, personal, and mixed. The quotations above made show that the pueblo people, or town Indians, were considered citizens, and that as to persons and properties there was no distinction made on account of origin, race, or caste, and the same work shows that when the Mexican nation changed their monarchy of New Spain into the republic of Mexico, the status of these citizens with regard to persons and property was affirmed, and I have not been able to ascertain from any source whatever, and it has not been shown here in argument, that their status was changed prior to the date of the treaty of Guadalupe Hidalgo.

We come now to consider the only legislation by our congress in relation to the lands of the pueblo of Taos, and other pueblos within the territory. This is contained in the act of December 22, 1858, entitled "An act to confirm the land claims of certain pueblos and towns in the territory of New Mexico:" 11 U. S. Stats. at Large, 374, from which is here only quoted what is necessary to show its bearing upon the lands of the pueblo of Taos: "The pueblo land claims in the territory of New Mexico designated in the corrected list as * * * 1. The pueblo of Taos, in the county of Taos * * * reported upon favorably by the surveyor-general of New Mexico in his report of the thirteenth of September, 1856, to the department of the interior * * * be, and they are hereby confirmed, and the commissioner of the land office shall issue the necessary instructions for the survey of all said claims, as recommended for confirmation by said surveyor-general, and shall cause a patent to issue therefor, as in ordinary cases to private individuals; *provided*, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist."

It is observable in the above-quoted act, the claimants to the lands of the pueblo of Taos, and of other pueblos mentioned, are not designated as Indians. However, inasmuch

as the United States have by this act quitclaimed the lands mentioned therein to the Taos and other pueblos, and say that it " shall not affect any adverse valid rights, should such exist," it seems to me that the contest as to the validity of adverse claims should be between the confirmees and the adverse claimants alone.

In this opinion several points were discussed merely because they have been argued by counsel of both parties in this court, although I doubt that they were properly brought before the court below.    The fact that the plaintiff's petition shows no right of action is of itself sufficient reason for affirming the judgment of the court below.*

* Judgment affirmed in the United States supreme court.    See 94 U. S. (4 Otto) 619.